**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Yerbaé, LLC,

          Plaintiff,

v.

Carl Sweat, et al.,

          Defendants.

No. CV-25-01686-PHX-KML

**ORDER**

After defendant Carl Sweat was terminated from his employment with plaintiff Yerbaé, LLC, he allegedly used Yerbaé's confidential and trade secret materials in developing a competing product. Yerbaé filed this suit against Sweat and Elite NIL Solutions LLC ("Elite"), a competing company Sweat founded shortly after his termination from Yerbaé. Sweat and Elite seek dismissal of the complaint. Elite's motion is granted while Sweat's is denied in large part.

## I.    Background

Arizona-based Yerbaé specializes in plant-based energy drinks. (Doc. 1 at 5.) In 2023, Yerbaé saw an opportunity to work with college athletes whom the National Collegiate Athletic Association ("NCAA") had recently permitted to monetize their "name, image, and likeness" ("NIL") rights through marketing and promotions. (Doc. 1 at 7.) To serve the new and niche NIL market and promote its products through student athletes, Yerbaé began developing "a novel business and marketing model" and "innovative product designs" customizing its drinks and marketing strategies to appeal to certain colleges. (Doc.

1 at 7.) It also began obtaining partnerships with NIL collectives, which act as "brokers" facilitating athletes' NIL opportunities. (Doc. 1 at 7.) To build and enhance the NIL program, Yerbaé formed a new board of directors in February 2023 which included Carl Sweat. (Doc. 1 at 10.) Yerbaé brought Sweat aboard to lead the NIL beverage program in part because of his previous beverage-industry experience. (Doc. 1 at 10.)

During his employment with Yerbaé, Sweat served as board member, head of Yerbaé's audit committee, management consultant, and president. (Doc. 1 at 10.) On February 8, 2023, Sweat entered into a Board of Directors Services Agreement ("BDSA"); on December 9, 2023, he entered into an Employee Confidentiality and Post-Employment Restrictions Agreement ("ECPRA"); and on December 21, 2023, he entered into a Yerbaé Employment Agreement ("YEEA").[1] (Doc. 1 at 11.) Sweat agreed to certain confidentiality restrictions in each contract. (Doc. 1 at 11-13.) He also agreed that for nine months after leaving Yerbaé, he would not directly or indirectly compete, solicit, or interfere with Yerbaé's products, business, or partners. (Doc. 1 at 14-15.)

Yerbaé's first college sports-themed product launched in the fall of 2023. (Doc. 1 at 9.) Over the course of this launch, Yerbaé claims it developed confidential and trade secret intellectual property ("IP") including business techniques, marketing materials, pre-launch product designs, final can design, and beverage flavor selection. (Doc. 1 at 10.) In December 2023, Sweat was elevated to serve as Yerbaé's president, with the NIL program as his "primary mission." (Doc. 1 at 16.) Yerbaé then began a partnership with the University of Georgia ("UGA") and CCC, its NIL collective. (Doc. 1 at 16-17.) Sweat had no prior relationship with CCC. (Doc. 1 at 16.) Yerbaé and CCC agreed Yerbaé would design, develop, and distribute a UGA-themed Yerbaé beverage which CCC would promote. (Doc. 1 at 17.) During the first quarter of 2024, Yerbaé and CCC developed promotional and can design materials, ultimately branding the UGA beverage "Red &

---

[1] The BDSA, ECPRA, and YEEA are attached as exhibits to the complaint and are incorporated by reference into it. *See Turner v. Nuance Commc'ns, Inc.*, 735 F. Supp. 3d 1169, 1179 (N.D. Cal. 2024) (incorporation by reference allows documents to be considered as if they are part of the complaint and is appropriate when "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim") (simplified).

Black" or "Red & Black Rush" and registering the domain name "redandblack.win." (Doc. 1 at 17-18.) Sweat assisted Yerbaé in securing a deal with Kroger to sell Yerbaé products. (Doc. 1 at 21.) And on April 6, 2024, Yerbaé launched an initial promotion of the UGA beverage with one of its "R&B Designs" at a UGA gala. (Doc. 1 at 20-21.)

Around when the Georgia Project began, Yerbaé alleges "Sweat engaged a third party website development and online company CTRL+ALT+Digital" ("CAD") without Yerbaé's knowledge or authority under a "highly unfavorable" agreement with "vaguely defined" terms. (Doc. 1 at 22.) Yerbaé states Sweat "actively concealed" why he made this agreement considering Yerbaé already had its own website and online marketer, and suggests he did so "for purposes of his own personal and/or business interests." (Doc. 1 at 22.) Yerbaé promptly terminated the contract once it was discovered, after which CAD filed a lawsuit against Yerbaé for breach of the agreement. (Doc. 1 at 22.)

Sweat was terminated on April 8, 2024. (Doc. 1 at 22.) Yerbaé alleges he conspired with CCC shortly afterwards to "unlawfully exploit[ ] Yerbaé's intellectual property rights[ ]" by launching "Red & Black Raw Sportswater" to replace Yerbaé's "Red & Black Rush" product. (Doc. 1 at 23.) Sweat formed Elite on April 10. (Doc. 1 at 23.) That same month, he launched a website called redandblack.win—the same domain name he had registered for Yerbaé—which advertises the competing product. (Doc. 1 at 23.) Yerbaé also alleges the competing product's design "clearly reveals that Sweat, acting in concert with Elite and CCC and without Yerbaé's knowledge or approval, took images and designs Sweat obtained during his employment at Yerbaé and used them to develop their 'Raw Sportswater' drink[.]" (Doc. 1 at 24.)

Yerbaé also alleges Sweat "is exploiting the exact same marketing tactics and distribution networks" from Yerbaé's R&B program and its general program IP. (Doc. 1 at 24.) For instance, Sweat's and Elite's store locator page on redandblack.win displays "substantially the same retailers that Yerbaé had identified and met with as its targets for the R&B Design product," information which was contained on a proprietary spreadsheet which Sweat failed to confirm he deleted post-termination. (Doc. 1 at 24.) In total, Yerbaé

alleges Sweat misappropriated seven distinct IP assets: (1) the R&B Design; (2) Yerbaé's "Design Brief" which contained "Georgia Project strategies, including its target customer pool, potential branding themes, selections of creative UGA-specific slogans and plans for exploiting them, key messaging for the target NIL market, and executional strategies"; (3) Yerbaé's "NIL Tracker" spreadsheet "which contained all the information Yerbaé had selectively compiled for tracking its timelines and efforts with potential NIL collectives and schools"; (4) Yerbaé's "Supply University Can Workflow Timeline" spreadsheet that "outlined the entire commercialization process and timeline for implementing the Yerbaé Product and Program IP"; (5) Yerbaé's "NIL Playbook" PowerPoint, which focused on Yerbaé's UGA-related IP as well as "all the necessary tools for the company to have a successful partnership with a school's NIL collective, serving as an instruction manual on how to successfully implement the Yerbaé Program IP"; (6) information on the "R&B Program," i.e., Yerbaé's plans regarding the UGA product; and (7) Yerbaé's "Store List" spreadsheet "that contained a list of all of Yerbaé's customer stores and retail targets for the Georgia Project." (Doc. 1 at 18-20, 24.)

Based on these facts, Yerbaé brings eight claims against Sweat and Elite.[2] It brings two breach of contract claims against Sweat separately alleging violations of the ECPRA and the YEEA; a tortious interference with contract claim against Sweat and Elite; a tortious interference with business expectancy claim against both defendants; misappropriation of trade secrets claims against both defendants under federal and Arizona statutes; an unjust enrichment claim against both defendants; and an indemnity claim against Sweat. (Doc. 1 at 25-32.)

## II.    Legal Standard

In opposing a defendant's motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish jurisdiction is proper. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). A plaintiff need only make a prima facie showing

---

[2] Yerbaé originally named CCC as a defendant and alleged Count 3 solely against it, but in November 2025, CCC settled and the claims against it were dismissed with prejudice. (Doc. 44.)

of jurisdictional facts where the motion is based on written materials and "uncontroverted allegations in the complaint must be taken as true," but a plaintiff cannot "simply rest on the bare allegations of its complaint." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted)). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.    Analysis

### A.  Elite's Motion to Dismiss

Yerbaé brings claims against Elite based on the theory that the company is Sweat's alter ego, making Sweat and Elite jointly and severally liable for the actions alleged. (Doc. 1 at 3.) Elite requests dismissal of all claims against it, arguing this court has no personal jurisdiction over it and Yerbaé has not sufficiently pleaded the alter ego theory. (Doc. 18 at 6-10.) Elite is correct on both counts so it is dismissed as a defendant, but Yerbaé may conduct limited jurisdictional discovery.

A defendant is subject to personal jurisdiction only when it has sufficient "minimum contacts" with a forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted); *see also In re Boon Glob. Ltd.*, 923 F.3d 643, 650-51 (9th Cir. 2019) (each defendant's contacts with forum state assessed individually). Yerbaé only attempts to establish specific jurisdiction, which requires Elite have "sufficient

contacts arising from or related to specific transactions or activities in the forum state." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017). In the Ninth Circuit, assessing specific personal jurisdiction requires determining 1) whether a defendant purposefully directed activities toward the forum state; 2) whether the claims arise out of or relate to the defendant's "forum-related activities"; and 3) whether exercising jurisdiction is reasonable because it "comport[s] with fair play and substantial justice." *Schwarzenegger*, 374 F.3d at 802. The plaintiff bears the burden of satisfying the first two prongs of the test. *Id.*

Yerbaé solely alleges tort claims against Elite. In the tort context, courts typically evaluate the first prong of specific personal jurisdiction using the "purposeful direction test," which requires the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Morrill*, 873 F.3d at 1142. An intentional act may satisfy this test when it "individually target[s]" a forum resident, *Schwarzenegger*, 374 F.3d at 807, but "mere injury to a forum resident" is not by itself a sufficient connection to the forum. *Walden v. Fiore*, 571 U.S. 277, 285, 290 (2014) ("the plaintiff cannot be the only link between the defendant and the forum"). "[S]omething more—conduct directly targeting the forum"— is required to confer personal jurisdiction. *Mavrix Photo*, 647 F.3d at 1229 (citation omitted).

Yerbaé alleges Elite committed intentional acts like contract interference (Doc. 31 at 9) which were expressly aimed at Arizona because, as Sweat knew, the trade secrets the defendants misappropriated were located in Arizona and Yerbaé felt the effects here (Doc. 31 at 17; *see also* Doc. 1 at 3). But Elite is headquartered in Georgia, and Yerbaé does not allege it has conducted any business in Arizona or targeted Arizona residents other than Yerbaé. (Doc. 1 at 23.) Personal jurisdiction may be conferred where a defendant targets forum residents *and* conducts business or advertises in a forum state. *See Briskin v. Shopify, Inc.*, 135 F.4th 739, 759 (9th Cir. 2025) (en banc). That is not what Yerbaé alleges: the only engagement Elite had with Arizona was its alleged injury to a forum resident, which

1    cannot provide the sole basis for personal jurisdiction. *Walden*, 571 U.S. at 285.

2         Yerbaé attempts to impute Sweat's actions onto Elite by describing Sweat as Elite's

3    principal, arguing that because Sweat agreed to personal jurisdiction in Arizona it is

4    reasonable to subject Elite to the same. (Doc. 31 at 12, 18.) But personal jurisdiction over

5    individual defendants does not automatically carry over to a related corporate defendant,

6    even where the individual defendant is the relevant corporation's founder.[3] *See Artec Grp.,*

7    *Inc. v. Klimov*, No. 15-CV-03449-RMW, 2015 WL 9304063, at *7 (N.D. Cal. Dec. 22,

8    2015). What matters for personal jurisdiction is not a defendant's knowledge that another

9    party is connected to a state, but its own contacts with the forum, and the complaint lacks

10   any such allegations regarding Elite here. *See Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,

11   874 F.3d 1064, 1069-70 (9th Cir. 2017).

12        This leaves only Yerbaé's argument that Elite is subject to personal jurisdiction in

13   Arizona because it is Sweat's alter ego. To pierce the corporate veil and establish that a

14   limited liability company may be treated the same as an individual for purposes of

15   jurisdiction, plaintiffs must show "(1) there is unity of control between parent and

16   subsidiary such that one is the 'alter ego' of the other, and (2) observing the corporate

17   form's privileges and protections would be unjust." *Specialty Companies Grp., LLC v.*

18   *Meritage Homes of Arizona, Inc.*, 492 P.3d 308, 310 (Ariz. 2021); *see Butler L. Firm, PLC*

19   *v. Higgins*, 410 P.3d 1223, 1229 (Ariz. 2018) (recognizing "LLCs, like corporations, are

20   amenable to . . . the alter-ego doctrine"); *see also Sandoval v. Ali*, 34 F. Supp. 3d 1031,

21   1040 (N.D. Cal. 2014) (plaintiffs' burden to sufficiently allege alter ego liability). Relevant

22   factors include "payment of salaries and expenses by the owner, an owners' making of

23   interest-free loans to the corporation, commingling of personal and corporate funds,

24   diversion of corporate property for personal use, and the observance of formalities at

---

25   [3] Yerbaé's argument that "Sweat is Elite's key (if not sole) principal," mentioned once in
26   a response brief with no supporting facts or relevant case law (Doc. 31 at 18 (citing *Deluca v. McMahon*, No. 1 CA-CV 09-0140, 2010 WL 682189 at *2, *4 (Ariz. Ct. App. Feb. 25,
     2010)), does not provide a basis for the court to find Sweat is actually Elite's principal,
27   even if such an allegation alone were sufficient for personal jurisdiction (which it is not).
     *See United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in
28   passing and not supported by citations to the record or to case authority are generally
     deemed waived.").

1  corporate meetings, among others." *Wolf Designs LLC v. Five 18 Designs LLC*, 635 F.

2  Supp. 3d 787, 802 (D. Ariz. 2022) (simplified). Facts supporting an alter ego relationship

3  must be pleaded relatively specifically at the motion-to-dismiss stage. *See Meister v. Fling*

4  *Enterprise Prevost LLC* No. CV-24-02943-PHX-JJT, 2025 WL 896465, at *3-4 (D. Ariz.

5  Mar. 24, 2025) (holding it is not sufficient to allege individuals commingled personal and

6  corporate assets without offering factual allegations regarding how).

7       Yerbaé asserts "Elite NIL is an 'alter ego' of Sweat" and "Sweat controls and uses

8  Elite as a mere tool or instrumentality in carrying out Sweat's own plans and purposes."

9  (Doc. 1 at 3.) It offers no further factual allegations supporting those conclusions in its

10  complaint and can point to none in its briefing. (*See* Doc. 1 at 3; Doc. 31 at 11-13.) Those

11  facts are not nearly as specific as those in the cases Yerbaé cites (*see* Doc. 31 at 11) and

12  are too conclusory to adequately allege alter ego status. *See id.*

13       Yerbaé argues in the alternative that it should be permitted to conduct jurisdictional

14  discovery on Elite's alter ego status. (Doc. 31 at 13-15.) "Discovery should ordinarily be

15  granted where 'pertinent facts bearing on the question of jurisdiction are controverted or

16  where a more satisfactory showing of the facts is necessary.'" *Butcher's Union Loc. No.*

17  *498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986)

18  (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir.

19  1977)); *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th

20  Cir. 2003) (district court abused discretion in denying jurisdictional discovery when

21  "[f]urther discovery on the issue might well demonstrate facts sufficient to constitute a

22  basis for jurisdiction[ ]"). Elite argues any jurisdictional discovery should be limited to just

23  its contacts with Arizona and not to Yerbaé's alter ego theory. (Doc. 33 at 11.) But it does

24  not meaningfully argue why this should be the case or provide case law supporting such an

25  outcome. (*See* Doc. 33 at 11.)

26       As such, Elite is dismissed, but Yerbaé is permitted to conduct limited jurisdictional

27  discovery on Elite's alter ego status and contacts with Arizona.

28

**B.  Sweat's Motion to Dismiss**

**1.  Breach of Contract (ECPRA)**

Yerbaé alleges Sweat violated various provisions of the ECPRA, including by disclosing confidential information, failing to return confidential information, and developing and marketing a competing beverage line within nine months of his termination. (Doc. 1 at 25-26.) Sweat argues the ECPRA cannot support a breach of contract claim because it was superseded by the YEEA. Sweat signed the YEEA twelve days after signing the ECPRA, and the YEEA contains an integration clause. (Doc. 17 at 4-5; *see* Doc. 1-2 at 4 (citing YEEA provision stating the YEEA "supersedes any prior agreements between [Sweat] and YERBAE").)

The parties' intent lies at the heart of determining whether one contract supersedes another. *Smith v. Neely*, 380 P.2d 148, 150 (Ariz. 1963). Contracts that cover a different scope are generally not intended to supersede each other. *Dunn v. FastMed Urgent Care PC*, 424 P.3d 436, 440 (Ariz. Ct. App. 2018) ("[E]ven a completely integrated agreement supersedes only prior agreements that are 'within the scope' of the new contract.") (quoting Restatement (Second) of Contracts § 213(2)). And all reasonable inferences must be drawn in favor of the plaintiff when there is any lack of clarity in how contracts relate to each other. *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022).

That Sweat entered into the ECPRA on December 9, 2023 and the YEEA on December 21, 2023 weighs strongly against finding the YEEA superseded the ECPRA. (*See* Doc. 1 at 11.) It is unlikely the parties intended to supersede a contract just twelve days after its signing without specifically referencing that supersession. *See Trico Elec. Coop., Inc. v. Sensus USA, Inc.*, No. CV 11-182 TUC-DCB, 2011 WL 13233552, at *4 (D. Ariz. Nov. 8, 2011) (unlikely parties intended one contract to supersede another which they had signed five months prior and which they did not "explicitly reference[]" as being superseded). The contracts also have a different scope. (Doc. 29 at 9.) The ECPRA governs confidentiality and post-employment use of Yerbaé information; it details confidentiality definitions and requirements, post-employment competition requirements, and post-

employment return of property. (Doc. 1-3.) Such terms are not included in the YEEA, which is a general employment agreement primarily focused on the terms of the parties' working relationship. (Doc. 1-2.) Although the YEEA does briefly and broadly touch on confidentiality and post-employment return of property, it does not include nearly the same comprehensive level of confidentiality-related and post-employment information (Docs. 1-2, 1-3). *See Dunn*, 424 P.3d at 441 (holding contracts which broadly discussed same terms nonetheless covered a different scope, one post-employment obligations and the other a transaction). Ultimately, it is very unlikely the parties intended a broad integration clause in a contract discussing general employment terms to supersede a very specific contract discussing post-employment confidentiality requirements—particularly just twelve days after the first contract's signing.

Sweat presents no other basis for dismissing the breach of contract claim. (Doc. 17 at 4-5.) Because the present record does not establish the ECPRA was superseded, his motion to dismiss this claim fails.

### 2. Breach of Contract (YEEA)

Yerbaé claims Sweat's actions violated various provisions of the YEEA also, listing seven pieces of confidential information which Sweat allegedly misused. (Doc. 1 at 26-27.) Sweat argues these do not fall under the "confidential information" definition because they are not "proprietary," "private," or "not generally known." (Doc. 17 at 5-6 (quoting Doc. 1-2 at 3).) He cites no legal authority supporting this argument and misstates the terms of the YEEA in doing so. (*Compare* Doc. 17 at 4-6 with Doc. 1-2 at 3.)[4] But more fundamentally, as Yerbaé argues (Doc. 29 at 11), this is not a legal dispute but a factual one as to whether the information Sweat allegedly stole falls within a reasonable interpretation of material the contract covers. "A motion to dismiss is not an appropriate mechanism for resolving factual disputes." *Tippitt v. Life Ins. Co. of N. Am.*, No. 17-CV-00125-VC, 2017 WL 3189464, at *1 (N.D. Cal. May 30, 2017). At this stage, whether

---

[4] Sweat's attempt to create a legal dispute by raising new arguments for the first time in his reply (Doc. 30 at 7-8) fail. *In re Bard IVC Filters Prod. Liab. Litig.*, 81 F.4th 897, 908 n.13 (9th Cir. 2023) ("Arguments raised for the first time in a reply brief are waived.").

seven pieces of information qualify as "confidential" according to a contract's definition is a question of fact that must be resolved in the plaintiff's favor. *See Rosen v. Walters*, 719 F.2d 1422, 1424 (9th Cir. 1983) (on motion to dismiss, courts generally construe facts in plaintiffs' favor).

Yerbaé has plausibly alleged Sweat misappropriated its confidential information in breach of the YEEA. (*See* Doc. 1 at 18-20, 24, 26-27.) Because factual disputes cannot be appropriately resolved now, Sweat's motion to dismiss Yerbaé's YEEA breach of contract claim fails.

### 3. Misappropriation of Trade Secrets under the Defend Trade Secrets Act ("DTSA") & the Arizona Uniform Trade Secrets Act ("AUTSA")

Yerbaé brings claims against Sweat for misappropriation of trade secrets under the federal DTSA and Arizona's AUTSA. (Doc. 1 at 29-31.) Sweat argues one of those counts must be dismissed because they duplicate each other. (Doc. 17 at 9.)

The DTSA requires allegations the plaintiff (1) owns a trade secret, (2) which the defendant misappropriated, (3) which caused damage to the plaintiff. *ReBath LLC v. HD Sols. LLC*, No. CV-19-04873-PHX-JJT, 2020 WL 7000071, at *2 (D. Ariz. Sept. 18, 2020). Meanwhile, to state a claim under the AUTSA, a damages allegation is not required; a plaintiff alleging a AUTSA claim "must allege that the defendant misappropriated a trade secret through improper means." *HTS Inc. v. Boley*, 954 F. Supp. 2d 927, 943 (D. Ariz. 2013). So contrary to Sweat's argument, the claims are not legally duplicative. And despite Sweat's contention otherwise (Doc. 17 at 9), complaints commonly plead claims under both statutes. *See, e.g.*, *Gordon Grado M.D., Inc. v. Phoenix Cancer & Blood Disorder Treatment Inst. PLLC*, 603 F. Supp. 3d 799, 809-12 (D. Ariz. 2022); *ReBath*, 2020 WL 7000071, at *2-3.

Although the claims are not duplicative, the elements of the two "are substantially similar" such that Sweat's remaining arguments under both statutes can be analyzed together. *Early Warning Servs., LLC v. Brandon O'Loughlin, P.A.Z.E. LLC*, No. 24-7315,

2025 WL 1895313, at *1 n.1 (9th Cir. July 9, 2025). Sweat alleges these claims fail because Yerbaé does not allege the trade secrets with sufficient specificity. (Doc. 17 at 10-16.) Under both the DTSA and AUTSA, a plaintiff must show the trade secrets exist and identify them. *Imax Corp. v. Cinema Techs., Inc*., 152 F.3d 1161, 1164 (9th Cir. 1998). A plaintiff "need not spell out the details of the trade secret," but must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade . . . and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881-82 (N.D. Cal. 2018) (citations omitted); *see also InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020).

Yerbaé has identified seven IP assets it alleges contained trade secrets and were misappropriated. (Doc. 1 at 18-20, 29-31.) The alleged trade secrets include an internal instruction manual on implementing programming, brand communication, target customers, product timelines, selling points, launch timing, internal designs, and lists of all of Yerbaé's customer stores and retail targets for its Georgia project. (Doc. 1 at 19-20, 24; *see* Doc. 29 at 13.) In specifying these IP assets and what they contain, Yerbaé has identified with sufficient particularity the trade secrets it believes Sweat misappropriated. *See Alta Devices*, 343 F. Supp. 3d. at 881-882; *see Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1051 (N.D. Cal. 2020) (denying motion to dismiss trade secret allegations including confidential product design specifications, source code, internal presentations, product strategy, and the company's marketing position). Further, Yerbaé specifically alleges there was no similar IP elsewhere in the burgeoning NIL industry (Doc. 1 at 8). *See InteliClear*, 978 F.3d at 658 (trade secret can be found where IP is "unique in the industry").

Sweat also argues the content allegedly misappropriated cannot be trade secrets because "the ideas described are publicly known or readily ascertainable." (Doc. 17 at 11.) For instance, according to Sweat, the R&B Design incorporates UGA's public imagery and colors, the Yerbaé Design Brief reflects the "routine work" of understanding an audience and developing slogans, and the NIL Tracker and Workflow Timeline merely describe

publicly-available contact information for marketing personnel. (Doc. 17 at 10-11.) But "a trade secret may include a grouping in which the components are in the public domain but there has been accomplished an effective, successful and valuable integration of those public elements such that the owner derives a competitive advantage from it." *Enter. Leasing Co. of Phoenix v. Ehmke*, 3 P.3d 1064, 1069 (Ariz. Ct. App. 1999) (citing *Rivendell Forest Products, Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1046 (10th Cir. 1994)). Yerbaé has made exactly such an allegation in stating it used public information to create internal strategy and materials which were unique in the industry and gave it an "edge on the competition." (Doc. 1 at 8.) And Yerbaé also describes other information which does not reference publicly-known ideas all. (*See* Doc. 29 at 19 (describing product timelines, program workflows, and marketing plans).)

Finally, Sweat contends Yerbaé did not plausibly allege he *used* the trade secrets at issue, arguing it is insufficient to generally allege Sweat's new products are similar to Yerbaé's (Docs. 17 at 11, 30 at 5-6). *See Alta*, 343 F. Supp. 3d at 883 (plaintiff must allege defendant actually used the trade secret information to which he had access); *Pellerin v. Honeywell Int'l, Inc*., 877 F. Supp. 2d 983, 990 (S.D. Cal. 2012) (not sufficient that plaintiff alleges defendant merely "took trade secrets and then performed the same work" for a competitor). "[T]here is no requirement that [a plaintiff] plead exactly how Defendants improperly obtained or used the alleged trade secret": a reasonable inference of misappropriation may arise when a plaintiff alleges access to trade secrets and substantial similarities in a product the defendant later develops. *Alta*, 343 F. Supp. 3d at 883 (internal quotations omitted). Yerbaé has made such an allegation here. (Doc. 1 at 23-25 (alleging Sweat did not confirm he deleted confidential materials on separating from employment and used "the exact same marketing tactics and distribution networks" as Yerbaé).) These allegations raise a plausible inference Sweat "used" Yerbaé's trade secrets. *See id*. (listing similarities and taking into account that defendant did not return confidential information to plaintiff on separating from employment); *Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 979 (D. Ariz. 2015) (denying motion to dismiss where plaintiff alleged

1    defendants who had access to trade secrets launched websites similar to plaintiff's with

2    similar strategy). Sweat's motion to dismiss Yerbaé's DTSA and AUTSA claims therefore

3    fails.

### 4. Tortious Interference with Contract and Tortious Interference with Business Expectancy

6        Yerbaé alleges Sweat interfered in its contract with CCC, UGA's NIL collective, by

7    inducing CCC's breach of contract and also interfered with business expectancy by using

8    Yerbaé's confidential information to develop a competing product. (Doc. 1 at 28-29.)

9    Sweat argues these claims are categorically preempted by the AUTSA because they stem

10   from the same "factual nucleus." (Doc. 17 at 6-7.)

11       The AUTSA explicitly preempts "conflicting tort, restitutionary and other laws of

12   this state providing civil remedies *for misappropriation of a trade secret*." A.R.S.

13   § 44-407(A) (emphasis added). But it does not cover misappropriation of confidential

14   information that is not a trade secret. *Id*. Accordingly, courts allow plaintiffs to use the

15   same facts to plead AUTSA claims alongside other claims covering information that may

16   later be found to fall outside the AUTSA's definition of "trade secret." *See Orca*

17   *Communications Unlimited, LLC v. Noder*, 337 P.3d 545, 550 (Ariz. 2014); *Universal*

18   *Engraving, Inc. v. Metal Magic, Inc*., 602 F. App'x 367, 369 (9th Cir. 2015) (AUTSA

19   displaces only claims regarding confidential information which has been found to fall

20   under AUTSA "trade secret" definition). This is true for tortious interference with contract

21   and tortious interference with business expectancy claims, which remedy injuries beyond

22   trade secret misappropriation and are therefore not preempted by the AUTSA at this stage.

23   A.R.S. § 44-407(A); *Orca*, 337 P.3d at 550 (whether confidential information fell within

24   AUTSA definition depended on "discovery and further litigation that has not yet

25   occurred"). And as alleged, neither claim here is "based solely upon the misappropriation

26   of trade secrets, but rather Sweat's *additional, improper acts* of disrupting [Yerbaé's]

27   contracts and business expectancies." (Doc. 29 at 15; *see also* Doc. 1 at 28-29.)

28       Sweat also argues Yerbaé's tortious interference with contract and tortious

interference with business expectancy claims are preempted by Arizona's economic loss doctrine. (Doc. 17 at 7-8.) That doctrine precludes tort recovery and "limit[s] a contracting party to contractual remedies" where the party only alleges economic damages. *Miidas Greenhouses, LLC v. Glob. Horticultural, Inc.*, 244 P.3d 579, 581-82 (Ariz. Ct. App. 2010) (simplified); *see also Ares Funding, L.L.C. v. MA Maricopa, L.L.C.*, 602 F. Supp. 2d 1144, 1150 (D. Ariz. 2009) (economic loss doctrine bars recovery "when the claim alleges only economic damages resulting from an alleged breach of contract") (simplified). Yerbaé's tortious interference claims allege only economic damage and are explicitly premised on Sweat's breach of contract. (Doc. 29 at 17 (conceding that "if Sweat had honored his contractual obligations owed to Yerbaé . . . Sweat would not have interfered with Yerbaé's relationships.").) Because the doctrine bars tortious interference claims unless they "grow out of circumstances independent of [the parties'] contractual relationship," *Finepoint Innovations, Inc*., No. CV 04–1318–PHX–SMM, 2006 WL 3313688, at *3 (D. Ariz. Nov. 13, 2006), Yerbaé's tort claims are dismissed with leave to amend.

### 5. Unjust Enrichment

Sweat argues Yerbaé's unjust enrichment claim is precluded because a valid contract exists and covers the dispute. (Doc. 17 at 16 (quoting *Physicians Surgery Ctr. of Chandler v. Cigna Healthcare Inc.*, 609 F. Supp. 3d 930, 939 (D. Ariz. 2022).) Yerbaé argues the claim should survive because it is pleaded in the alternative to its breach of contract claims. (Doc. 29 at 22-23; *see* Doc. 1 at 31 (pleading unjust enrichment "[t]o the extent that [its] other claims against Defendants are deemed legally insufficient").)

To successfully plead unjust enrichment, a complaint must include facts supporting "the absence of a legal remedy." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 833 (D. Ariz. 2016) (simplified). Accordingly, where a party asserts an unjust enrichment claim alongside a breach of contract claim in which the contract covers the scope of the dispute, the possible contractual remedy may foreclose an unjust enrichment claim. *Brooks v. Valley Nat. Bank*, 548 P.2d 1166, 1171 (Ariz. 1976); *see also Physicians Surgery Ctr.*, 609 F. Supp. 3d at 939; *Sutter Home Winery, Inc. v. Vintage Selections, Ltd*., 971 F.2d 401, 408

(9th Cir. 1992). But a party may bring an unjust enrichment claim in the alternative "where her inability to enforce the contract leaves her without an adequate remedy at law," *Cheatham*, 161 F. Supp. 3d at 833, and where the party has not received the benefit of the contractual bargain, *Adelman v. Christy*, 90 F. Supp. 2d 1034, 1045 (D. Ariz. 2000). *See also Lopez v. Musinorte Ent. Corp*., 434 F. App'x 696, 699 (9th Cir. 2011) ("a plaintiff can pursue an unjust enrichment claim as an alternative theory of recovery in conjunction with a breach of contract claim, subject, however, to only one recovery").

Yerbaé alleges Sweat breached two contracts which together govern the scope of the unjust enrichment claim (Doc. 1 at 27-28), but specifically pleads unjust enrichment in the alternative in case the other claims "are deemed legally insufficient" and thereby foreclose a remedy provided by law. (Doc. 1 at 31). At this stage, it remains possible a "jury could find that no contract exists" or that the contracts are invalid. *Victory Ins. & Fin. Servs. LLC v. Ben Oberg Enters. LLC*, No. CV-23-08015-PCT-DJH, 2025 WL 661879, at *4 (D. Ariz. Feb. 28, 2025) (allowing unjust enrichment claim to proceed in the alternative). It also remains possible a jury could find Yerbaé did not receive the benefit of the contractual bargain due to Sweat's alleged failure to fulfill his end of the contract. *Adelman*, 90 F. Supp. 2d at 1045. Accordingly, the motion to dismiss this claim is denied.

## 6. Indemnity

Yerbaé alleges it is "entitled to contribution and/or indemnity from Sweat in the amount of attorneys' fees and other expenses incurred by [Yerbaé]" as a result of the lawsuit CAD filed against Yerbaé. (Doc. 1 at 32.) Yerbaé's briefing makes clear it intended to raise a common-law indemnity claim. (Doc. 29 at 23.)

To state a common-law indemnity claim, a plaintiff must show (1) "it has discharged a legal obligation owed to a third party," (2) "the indemnity defendant was also liable to the third party," and (3) "as between itself and the defendant, the obligation should have been discharged by the defendant." *SRK Consulting, Inc. v. MMLA Psomas, Inc.*, No. CV-09-0611-PHX-GMS, 2009 WL 2450490, at *3 (D. Ariz. Aug. 11, 2009) (quoting *MT Builders, L.L.C. v. Fisher Roofing, Inc.*, 197 P.3d 758, 764 (Ariz. Ct. App. 2008)). Though

Sweat asserts otherwise (Doc. 17 at 17), a common-law indemnity claim does not require a contract between the parties. *San Luis Facility Dev. Corp. v. Cmty. Educ. Centers Inc.*, No. CV 14-02633-PHX-DMF, 2016 WL 11528604, at *4 (D. Ariz. June 9, 2016); *see also Evans Withycombe, Inc. v. W. Innovations, Inc*., 159 P.3d 547, 552-53 (Ariz. Ct. App. 2006). But such a claim "does not accrue until the indemnitee has suffered actual loss." *Levin v. Hindhaugh*, 804 P.2d 839, 840 (Ariz. Ct. App. 1990)).

The complaint alleges Yerbaé "incurred expenses and impoverishment" in defending against CAD's lawsuit, including attorneys' fees and expenses. (Doc. 1 at 32.) Attorneys' fees may qualify as an actual loss sufficient to state a claim for *contractual* indemnity. *See Symantec Corp. v. CD Micro, Inc.*, No. 02-406-KI, 2005 WL 6163440, at *2-3 (D. Or. Feb. 24, 2005). But the same is not true in common-law indemnity cases until a judgment or settlement has been reached, because "it is an indemnitee's actual wrongdoing or lack of it, rather than allegations of wrongdoing, which determine the indemnitee's rights." *INA Ins. Co. of N. Am. v. Valley Forge Ins. Co.*, 722 P.2d 975, 980 (Ariz. Ct. App. 1986); *Payless Shoesource, Inc. v. Pac. Emps. Ins. Co*., No. CV-08-2317-PHX-DGC, 2009 WL 4439267, at *4 (D. Ariz. Nov. 24, 2009) (indemnity claim "accrues only when liability is established or when an indemnitee actually pays a sum to discharge potential liability").

Yerbaé has since settled the case with CAD. (Doc. 29 at 23.) Settlements may give rise to indemnity claims where those settlements reflect a discharge only of the liability at issue. *KnightBrook Ins. Co. v. Payless Car Rental Sys., Inc*., 356 F. Supp. 3d 856, 860 (D. Ariz. 2018); *see also SRK Consulting, Inc*., 2009 WL 2450490, at *4. But the court cannot consider the settlement here because it was not alleged in the complaint and even if judicial notice had been properly requested, the settlement documents Yerbaé provided do not include details to allow the court to determine whether the settlement reflected a discharge only of the liability at issue. (*See* Docs. 29-1, 29-2.) As such, the claim is dismissed with leave to amend.

**IV.     Conclusion**

        The claims against Elite are dismissed for lack of personal jurisdiction. Yerbaé is given a short period in which to conduct jurisdictional discovery. All claims against Sweat can proceed except the tortious interference with contract, tortious interference with business expectancy, and indemnity claims, which are dismissed with leave to amend. Because some claims are proceeding the parties must prepare and file their Rule 26(f) Joint Case Management Report as set forth below. Preparing and filing that report does not impact the deadline for filing of an amended complaint regarding the claims against Sweat dismissed in this order. Nor does preparing and filing the report impact the deadline for filing an amended complaint regarding claims against Elite.

        Accordingly,

        **IT IS ORDERED** Sweat's motion to dismiss (Doc. 17) is **GRANTED IN PART WITH LEAVE TO AMEND**. If plaintiff wishes to amend its claims against Sweat, it shall file an amended complaint no later than **January 20, 2026**.

        **IT IS ORDERED** Elite's motion to dismiss (Doc. 18) is **GRANTED**. Plaintiff is granted leave to conduct discovery regarding personal jurisdiction. That discovery shall be completed within sixty days of this order and if plaintiff wishes to pursue claims against Elite, it shall file an amended complaint within ten days of the close of discovery. Multiple defendants represented by the same counsel may not file separate dispositive motions. Defendants represented by the same counsel who wish to file a dispositive motion must file a single joint motion that includes all arguments applicable to any defendant.

        **IT IS FURTHER ORDERED as follows**:

        The parties are directed to meet, confer, and develop a Rule 26(f) Joint Case Management Report, which must be filed **within 4 weeks of the date of this order**. It is the responsibility of plaintiff(s) to initiate the Rule 26(f) meeting and prepare the Joint Case Management Report. Defendant(s) shall promptly and cooperatively participate in the Rule 26(f) meeting and assist in preparation of the Joint Case Management Report.

        The Joint Case Management Report shall contain the following information in

separately-numbered paragraphs.

1. The parties who attended the Rule 26(f) meeting and assisted in developing the Joint Case Management Report;

2. A list of all parties in the case, including any parent corporations or entities (for recusal purposes);

3. Any parties that have not been served and an explanation of why they have not been served, and any parties that have been served but have not answered or otherwise appeared;

4. A statement of whether any party expects to add additional parties to the case or otherwise amend pleadings;

5. The names of any parties not subject to the court's personal (or *in rem*) jurisdiction;

6. A description of the basis for the court's subject matter jurisdiction, citing specific jurisdictional statutes. If jurisdiction is based on diversity of citizenship, the report shall include a statement of the citizenship of every party and a description of the amount in dispute. *See* 28 U.S.C. §1332;

7. A short statement of the nature of the case (no more than three pages), including a description of each claim, defense, and affirmative defense;

8. A listing of contemplated motions and a statement of the issues to be decided by those motions;

9. Whether the case is suitable for reassignment to a United States Magistrate Judge for all purposes or suitable for referral to a United States Magistrate Judge for a settlement conference;

10. The status of any related cases pending before this or other courts;

11. A discussion of any issues relating to preservation, disclosure, or discovery of electronically stored information ("ESI"), including the parties' preservation of ESI and the form or forms in which it will be produced;

12. A discussion of any issues relating to claims of privilege or work product;

13.    A discussion of necessary discovery, which should take into account the December 1, 2015 amendments to Rule 26(b)(1) and should include:

    a.    The extent, nature, and location of discovery anticipated by the parties and why it is proportional to the needs of the case;

    b.    Suggested changes, if any, to the discovery limitations imposed by the Federal Rules of Civil Procedure;

    c.    The number of hours permitted for each deposition. The parties also should consider whether a total number of deposition hours should be set in the case, such as twenty total hours for plaintiffs and twenty total hours for defendants. Such overall time limits have the advantage of providing an incentive for each side to be as efficient as possible in each deposition, while also allowing parties to allocate time among witnesses depending on the importance and complexity of subjects to be covered with the witnesses;

14.    Proposed deadlines for each of the following events. In proposing deadlines, the parties should keep in mind the Case Management Order will contain deadlines to govern this case and once the dates have been set the court will vary them only upon a showing of good cause. A request by counsel for extension of discovery deadlines in any case that has been pending more than two years must be accompanied by a certification stating the client is aware of and approves of the requested extension. The court does not consider settlement talks or the scheduling of mediations to constitute good cause for an extension. The parties must propose the following:

    a.    A deadline for the completion of fact discovery, which will also be the deadline for pretrial disclosures pursuant to Rule 26(a)(3). This deadline is the date by which all fact discovery must be *completed*. Discovery requests must be served and depositions noticed sufficiently in advance of this date to ensure reasonable completion

by the deadline, including time to resolve discovery disputes. Absent extraordinary circumstances, the court will not entertain discovery disputes after this deadline;

b.    Dates for full and complete expert disclosures and rebuttal expert disclosures, if any;

c.    A deadline for completion of all expert depositions;

d.    A date by which any Rule 35 physical or mental examination will be noticed if such an examination is required by any issues in the case;

e.    A deadline for filing dispositive motions;

f.    Case-specific deadlines and dates, such as the deadline to file a motion for class certification or a date on which the parties are available for a *Markman* (patent claim construction) hearing;

g.    A date by which the parties shall have engaged in face-to-face good faith settlement talks;

h.    Whether a jury trial has been requested and whether the request for a jury trial is contested, setting forth the reasons if the request is contested;

i.    Any other matters that will aid the court and parties in resolving this case in a just, speedy, and inexpensive manner as required by Federal Rule of Civil Procedure 1;

15.    A statement indicating whether the parties would prefer that the court hold a case management conference before issuing a scheduling order—and, if so, an explanation of why the conference would be helpful.

/

/

/

/

/

1   **IT IS FURTHER ORDERED** the parties shall file a proposed Case Management

2   Order containing all the proposed dates at the same time they file the Rule 26(f) Case

3   Management Report. The proposed Case Management Order must also be emailed in Word

4   format to Lanham_Chambers@azd.uscourts.gov.

5       Dated this 5th day of January, 2026.

6

7

8

           **Honorable Krissa M. Lanham**

9               **United States District Judge**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28